

**ROBERT A. GORDON**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | | |
|---|---|---|---|
| In Re: | * | | |
| Harry E. Lindsley | * | Case No. | 05-39583-RAG |
| | * | Chapter | 7 |
| | * | | |
| Debtor | * | | |
| ************************************* | * | | |
| Frank and Cathleen Dubois | * | | |
| | * | | |
| | * | | |
| Plaintiffs | * | | |
| vs. | * | Adversary | No. 06-1102 |
| Harry E. Lindsley | * | | |
| | * | | |
| | * | | |
| Defendant | * | | |

## MEMORANDUM OF DECISION IN SUPPORT OF
## ORDER DETERMINING DEBT TO BE NONDISCHARGEABLE

This case presents the following question: does an experienced mortgage broker and real

estate professional who engineers and causes the establishment of an environmental easement and

mitigation credit bank as to certain valuable real estate which he owns, act with the requisite

fraudulent intent for purposes of 11 U.S.C. § 523(a)(2)(A) when he conveys and transfers the same

real estate in fee simple to good faith purchasers for value but continues to sell those mitigation

credits to third parties such that the resulting debt should be excepted from his discharge?  Based upon the totality of the facts and circumstances of this case, the Court concludes for the reasons explained herein that the resulting indebtedness may not be excepted from the Debtor's discharge and instead shall be declared non-dischargeable.

**I.  Preliminary Statement**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and § 157 and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).  The Court's findings of fact and conclusions of law in accordance with F. R. Bankr. P. 7052(a) are set forth below.  Findings of fact misidentified as conclusions of law shall be deemed to be findings of fact and conclusions of law misidentified as findings of fact shall be deemed to be conclusions of law.

On October 14, 2005, Harry Lindsley, the Debtor in this case and Defendant in this Adversary Proceeding, filed a petition under Chapter 7 of Title 11 of the United States Code.  On May 24, 2006, the Chapter 7 Trustee, Lori S. Simpson, filed a Report of No Distribution.  Thus, there are no assets available to satisfy the claims of unsecured creditors of Debtor's bankruptcy estate.  On June 14, 2006, Debtor received his discharge of pre-petition debt under 11 U.S.C. § 727(b).

On January 26, 2006, Plaintiffs, Frank and Cathleen Dubois, filed a timely one-count Complaint (Dkt. No. 1) against Mr. Lindsley, asserting that the judgment entered against Debtor and in their favor by the Circuit Court for Anne Arundel County on August 8, 2005, in the amount of $135,347.30, is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).[1]  Debtor filed an Answer to Plaintiffs' Complaint (Dkt. No. 4) on February 28, 2006.  Thereafter, discovery was conducted

---

[1] Hereafter, all statutory citations are to the Bankruptcy Code, found at Title 11 of the United States Code, unless otherwise noted.

and the Parties filed cross Motions for Summary Judgment (Dkts. Nos. 15 and 16) on June 29, 2006

and July 13, 2006, respectively.  The Court denied both motions on September 8, 2006[2] and this

matter preceded to trial on October 10, 2006.

Most of the underlying facts are not in serious dispute.  The real estate in question is located

in Anne Arundel County and is known as 5990 Deale Beach Road, Deale, Maryland 20751 (Real

Estate).  After Debtor caused his alter-ego entity, Marte Lynn, Inc. (MLI)[3], to purchase the Real

Estate in fee simple he took steps to formally establish a conservation easement on portions of the

land.[4]  This carried with it a measure of altruism as one immediate effect was to environmentally

shield the designated property from development and attendant destruction.  However, it also had

the pull of profit at its base as it enabled Debtor to create a "Mitigation Bank" from which he could

---

[2] The Court noted on the Orders denying the cross Motions that there "exist genuine
issues of material fact to be resolved at trial, including whether Defendant acted with the
requisite intent for the debt to be judged to be nondischargeable under Section 523(a)(2)(A)".
Conveniently, the motions narrowed the dispute to that issue and thus made it easy to deny both
prayers for summary judgment.

Defendant acknowledged in his motion that the credit sales were sales of the Plaintiffs'
legal interests.  Nevertheless he attributes the sales to a "mistake" on his part and asserts that he
had no "intent" to cause Plaintiffs harm.  Defendant's Motion for Summary Judgement at 2.
Plaintiff countered with substantial evidence tending to show that Defendant's conduct was
accompanied by a significant level of secrecy and deception, thus implying fraudulent intent.
Notwithstanding the compelling quality of Plaintiffs' evidence, because the Defendant asserted
in sworn testimony that he did not intend to commit fraud, a genuine dispute as to a material fact
was therefore presented.

[3] MLI is wholly owned and operated by the Defendant and appears to have had no
substantive purpose other than to own the Real Estate and serve as a vehicle to establish the
conservation easement and mitigation credit bank from which this dispute arises.

[4] Maryland law expressly allows for the creation of conservation easements.  See Md.
Code Ann., Real Prop. § 2-118.  Such an easement, whether drafted in the form of an easement,
covenant, restriction, or condition, when not granted in favor of a dominant estate, is enforceable
in both law and equity as an easement in gross.

sell so-called Mitigation Credits (Credits) to property developers enabling them to legally offset the deforestation and reduction of wetlands caused by their projects.[5]

Debtor subsequently sold the Real Estate to Plaintiffs. However, notwithstanding that sale of all his tangible and intangible interests in the Real Estate (and unbeknownst to Plaintiffs), he continued to sell Credits from the Mitigation Bank to developers for several years thereafter. Upon discovering this, Plaintiffs brought litigation against Debtor and recovered the judgment mentioned above for the full value of the Credits unlawfully sold by him. The litigation was grounded upon the simple premise that the Credits were their property, appurtenant to their fee interest in the Real Estate, and not the Defendant's to sell. Plaintiffs now seek to have the Court determine that this judgment is nondischargeable as obtained by fraud.

Debtor acknowledges that he continued to sell Credits from the Mitigation Bank after the Real Estate was sold to Plaintiffs and does not dispute his liability for the underlying debt rendered to judgment. In his defense, Debtor simply claims that the ongoing sales were the result of an innocent mistake on his part - namely, that he reasonably believed that the Credits were still his to sell. Therefore, he asserts, he cannot be held liable for fraud as he intended no wrongdoing.

Thus, the central question is whether Debtor acted with the requisite intent to complete the case for fraud, and nondischargeability, under Section 523(a)(2)(A). For the reasons that follow, the Court finds that Debtor's claims of ignorance and misunderstanding are wholly unconvincing and therefore finds that he acted with an abundance of fraudulent intent. Accordingly, the judgment in favor of Plaintiffs shall be excepted from Mr. Lindsley's Discharge in this Chapter 7 case.

---

[5] Other than the Declaration of Covenants, Conditions, and Restrictions (Declaration) introduced as Plaintiffs' Exhibit No. 6, there was no documentary evidence submitted regarding the creation or management of the Mitigation Bank.

## II.  Factual Background

Debtor is a self-professed mortgage broker and real estate professional with extensive experience in these fields.[6]  Debtor is also the president and sole shareholder, employee, and director of MLI, his alter-ego corporation formed to engage in the business of real estate, and environmental, consulting.  In 1994, Debtor, via MLI[7], contracted to purchase the Real Estate.  The sale closed in February 1996.  Debtor testified that his primary interest in the Real Estate was as an investment asset.  Indeed, it apparently remained in an unimproved, raw state during the time he held dominion over it.

However, Debtor testified that when he purchased the Real Estate it was brought to his attention that six acres, more or less, would be suitable for the development of a wetland and reforestation mitigation bank.  Debtor's goal in establishing a "consolidated off-site mitigation area" on that acreage was to sell environmental mitigation credits to developers to offset the environmental effects of their projects elsewhere.  Mr. Lindsley testified that "the credits were developed through the efforts of my environmental [sic], Doug Musser of ERS [Environmental Resource Services], and along with the County, State and the Corp of Engineers."  Transcript of Record at 27.  The exact nature of Mr. Lindsley's relationship with ERS was never fully explained.

---

[6] Debtor testified at trial that he has been a mortgage broker for 12 years.  In May 2006, at his deposition in this Adversary Proceeding, Debtor said he was employed by Lending Mortgage Services.  In June 2005, at his deposition in the Anne Arundel County litigation, Debtor testified in detail about his employment background.  See Plaintiffs' Exh. 7.  At that time, Debtor was employed by several self-owned and operated companies including MLI and Lending Services, Inc.   As with MLI, Debtor was the president and sole shareholder of Lending Services, Inc., an entity involved in mortgage banking.  Prior to this time, Debtor was employed for 6 years as a loan officer with Peoples Mortgage Corporation, for 2 years as a loan officer with Fairfax Mortgage Company, and for a period of 5-10 years by Lindsley Insurance Agency and Lindsey Realty in New Jersey.  Debtor testified he was familiar with real estate transactions and mortgage lending.

[7] Hereafter, Debtor and MLI will be used interchangeably.

However, from his testimony it appears ERS carried a heavy workload from the Defendant with respect to the establishment of the easement and credit bank, the "management" of the same and the facilitation of later credit sales.  So appealing to Debtor was the idea of owning a credit bank, that he began to work on its establishment prior to his closing on the purchase of the Real Estate in 1996.

 The total tract of land consists of 8 acres, more or less.  To lay the foundation for the Mitigation Bank, Debtor granted Anne Arundel County a conservation easement over slightly more than 6 of those acres.[8]  There was testimony that the conditions and restrictions of the conservation easement are set forth in two separate declarations of covenants, recorded in the appropriate Land Records.[9]  Debtor testified that while he did work with ERS, and County and State agencies, to create the easement and Mitigation Bank, he was not represented by legal counsel in this endeavor.  According to Debtor, this was the first time he had been involved in setting up a mitigation bank and the first one ever established in Anne Arundel County.  MLI did not own, and was not involved in creating, any other mitigation banks nor did it conduct any other business. After receiving final approval for the project, Debtor began selling the Credits in either 1997 or 1998.[10]  The Credits were marketed through a variety of means to builders, developers and engineers who might have a need for this unique and specialized product.

---

[8] At one time, the Real Estate formed part of a golf course but subsequently became heavily wooded.  It includes approximately 600' of river-front access and a driveway leading to the dwelling.

[9] The Declaration dated February 23, 1998 was the first of the two and the only one offered into evidence.  It effectively created a "conservation property" on 4.504 acres of the total 8.1679.  In part it provided that there shall be no construction or defoliation on the conservation property and called for the continued maintenance of the property in generally the same forested condition as it existed at the time of the easement's creation.  Per the Declaration, Anne Arundel County has the power to enforce the easement.  Plaintiffs' Exh. 6.

[10] It is not clear at all when final approval for the Mitigation Bank was given or which entity, or group, gave that final approval.

In early 2000, Debtor decided to list the Real Estate for sale with a broker. The Full Listing (Listing), dated April 7, 2000, explicitly stated that 6 acres of the property were subject to the conservation easement.[11] The stated asking price was $299,900. Plaintiffs' Exh. 2. On April 10, 2000, Plaintiffs, who had never met Mr. Lindsley before engaging in this transaction, submitted an offer to his realtor in the amount of $289,000. Plaintiffs' Exh. 3. The offer was accepted and Plaintiffs subsequently purchased the Real Estate from MLI. The transaction closed on May 31, 2000 and title was formally transferred by recordation of the Deed on June 30, 2000. Plaintiffs' Exh. 1.

Ordinarily, it might be considered quaintly archaic in this day and age to pause for a recitation of the language of a real property deed that defines the nature of the estate conveyed. Save for an anxiety-gripped first year law student, this level of detail is usually passed over with a minimum of concern. However, it is worth accentuating here in light of Mr. Lindsley's extensive real estate background and his professed claim that at the time of settlement he believed that somehow the ownership of the Credits had been severed from the land itself. As evidenced by the Deed, MLI transferred fee simple title to Plaintiffs as tenants by the entirety, together "with the buildings and improvements thereon erected, made or being; and all and every, the *rights*, alleys, ways, waters, *privileges*, *appurtenances*, and *advantages thereto belonging, or in anywise appertaining*" in exchange for the purchase price. Plaintiffs' Exh. 1 (emphasis supplied). Thus, there was no limitation upon the estate conveyed by the Deed. Likewise, no interests or rights were carved out to remain in the seller.

---

[11] Under "Remarks", the Listing reads "Fabulous piece of waterfront acreage. Total of 8.16 acres. 6 acres of lot is in conservation easement. Homesite is approx. a 2.16 acre site". Plaintiffs' Exh. 2. "Ownership" was given as "Fee Simple, Sale".

Hence, without an express instrument stating to the contrary it appears that rights to any Mitigation Credits remaining would convey with the land.[12]  And later events, namely the Debtor's post-settlement sales of Credits, demonstrated that there was ample credit value remaining in the Mitigation Bank at the time of settlement.  The question of whether such value existed was explicitly raised at settlement by Mr. Dubois.  He testified that he "asked him [Debtor] if all the credits had been sold, and he said, yes, they had been sold at the closing."  Transcript of Record at 9.  This representation was patently false.  Moreover, Debtor admitted during discovery that "at no time prior to settlement or at settlement, did MLI or Lindsley divulge to Plaintiffs that MLI and Linsdley intended to continue selling mitigation credits or rights associated with the Property after the Property was sold to Plaintiffs".  See Plaintiffs' Exh. 8 (Answer to Plaintiff Frank Dubois's Request for Admission Number 13).[13]  Thus, there was evidence that on May 31, 2000, Debtor expressly denied there was any credit value in the Mitigation Bank while he knew that to be false and had every intention of continuing to profit from that value.

After closing, Debtor followed through on his acknowledged intention by continuing to sell the Credits to third parties, engaging in at least 15 different sales transactions from August 2000 until January 2003.[14]  For each transfer (and notwithstanding the sale to Plaintiffs), Debtor used identical form contracts that expressly identified MLI as the owner of the Real Estate.  These form

_____

[12] The Court assumes that this was the basis for the Circuit Court's finding in favor of the Duboises.  The burdens created by the conservation easement in favor of the County, pursuant to the terms of the Declaration, run with the land in perpetuity and apply to any successors in title to Debtor.  Plaintiffs' Exh. 6.  Since the Plaintiffs took fee simple title (the greatest title known by the law) to the Real Estate subject to the burdens of the conservation easement, any rights created pursuant to the easement likewise became property of the Plaintiffs.

[13] This admission was conclusively established for trial.  See Fed. R. Civ. P. 36(b), as incorporated by Fed. R. Bankr. P. 7036.

[14] See Plaintiffs' Exh. 8, Defendant's Answers to First Request for Admissions, nos.14, 17-30.

contracts, prepared by ERS, were the same he had used prior to the May 2000 settlement with the Plaintiffs.   Debtor's signature, as President of MLI, appears next to the word "LANDOWNER" (capital letters in original document) on each contract.[15]   There is no dispute that neither Mr. Lindlsey, nor MLI, were the owners of the underlying land at the time he signed these sales agreements.

On October 22, 2004, Plaintiffs filed a lawsuit for constructive fraud against Debtor in the Circuit Court for Anne Arundel County.   They asserted that Debtor sold the subject Credits to various property developers at a time when they belonged to Plaintiffs and therefore Debtor was liable to them for damages measured by the value of each sale.   On August 8, 2005, the Circuit Court for Anne Arundel County granted summary judgment in Plaintiffs' favor and entered a money judgment against Debtor in the amount of $135,347.30.[16]   Approximately two months later, Debtor filed his bankruptcy case under Chapter 7 in an attempt to have this debt discharged under Section 727.   Plaintiffs then filed this instant action seeking to have their judgment declared nondischargeable under Section 523(a)(2)(A) and in that manner excepted from Mr. Lindsley's discharge.

---

[15] The contracts are titled "MARTE LYNN CONSOLIDATED OFFSITE WETLAND MITIGATION AREA - AGREEMENT OF SALE".   The one-page contracts each identify MLI as 'landowner' in 3 distinct places.  See Plaintiffs' Exh. 28.

[16] The Circuit Court for Anne Arundel County did not make a finding of fraud in awarding the judgment and Plaintiffs do not attempt to rely upon any form of collateral estoppel. Debtor stated in his Motion for Summary Judgment that Plaintiffs "obtained summary judgment against the Defendant based upon the indisputed (sic) facts that the sales took place" (Dkt. No. 15, pg. 4).  Thus, this Court is justly empowered to make independent findings for the purpose of determining the dischargeability of the debt under the Bankruptcy Code. *Archer v. Warner*, 538 U.S. 314, 321 (2003);  *Brown v. Felsen*, 442 U.S. 127, 138 (1979).

### III.  Legal Standards

Under Section 523(a)(2)(A), debts "for money, property, services" are nondischargeable "to the extent obtained, by - false pretenses, a false representation, or actual fraud".[17]  While the underlying validity of a creditor's claim is determined by state law, the issue of nondischargeability is a matter of federal law governed by the Bankruptcy Code.  *Grogan v. Garner*, 498 U.S. 278, 283-284 (1991), citing to *Brown v. Felsen*, 442 U.S. 127, 129-130 (1979).  The standard of proof for Section 523(a)'s dischargeability exceptions is the ordinary preponderance-of-the-evidence standard.  *Grogan*, 498 U.S. at 661.

Section 523(a)(2)(A) finds its genesis in the common law of torts.  *Field v. Mans*, 516 U.S. 59, 70 (1995).  Its operative terms, "false pretenses, a false representation, or actual fraud", are terms of art that imply the elements the common law has defined them to include.  *Id.*  With that in mind, it is settled that in order to sustain an action under Section 523(a)(2)(A) a plaintiff must satisfy five elements.  *Grogan v. Garner*, 498 U.S. 279, 288 (1991);  *In re Rountree*, 478 F.3d 215, 218 (4th Cir. 2007);  *In re Koep*, 334 B.R. 364, 371-72 (Bankr. D. Md. 2005);  *In re Pleasants*, 231 B.R. 893, 897 (Bankr. E.D. Va. 1999), *aff'd*, 219 F.3d 372 (4th Cir. 2000).  In order, they are:

1.   That a representation was made by the defendant;

2.   That the defendant know that the representation was false when she made it;

---

[17] Section 523(a)(2)(A) provides:
(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

3.      That the defendant made the representation with the intent and purpose of deceiving the plaintiff;

4.      That the plaintiff justifiably relied on the false representation; and

5.      That plaintiff suffered damages as a proximate result of the representation.

*Koep*, 334 B.R. at 372.  A misrepresentation can be any words or conduct which produce a false or misleading impression of fact in the mind of another.  *Pleasants*, 231 B.R. at 897.  An omission may constitute a misrepresentation where the circumstances are such that a failure to speak or act creates a false impression.  *Id.*

During Closing Argument, Debtor's Counsel only challenged the existence of the third element – Debtor's intent – and did not dispute the existence of the other four elements.[18] Specifically, Debtor claims his mistaken belief as to the facts should not saddle him with a nondischargeable debt.  Thus, at trial he sought to prove the purity of his heart by establishing that:

(a).    He legitimately believed that he had the ongoing right to continue to sell Credits from the Mitigation Bank;

(b).    Documents, including public records, relevant to the existence of the Mitigation Bank confirmed this belief; and

(c).    His, and MLI's, ongoing obligation to manage the conservation easement translated into a corresponding right to the benefit of the value of the Mitigation Credits.

---

[18] The same stance was effectively taken by Mr. Lindsley in his Motion for Summary Judgment.  The totality of the circumstances do establish that Mr. Lindsley obtained property from the Plaintiffs and they were damaged as a result.  Furthermore, as noted above, Mr. Dubois gave undisputed testimony as to Debtor's express representation that all of the Credit value in the Mitigation Bank had been exhausted at the time of settlement.  Moreover, Mr. Lindsley, did not dispute that Mr. and Mrs. Dubois justifiably relied upon that representation and, clearly, the evidence supported that conclusion.  See *Field*, 516 U.S. at 62 (level of reliance required by fraud exception to discharge under Section 523(a)(2)(A) is not reasonable reliance, but the less demanding standard of justifiable reliance).

-11-

The case law provides that intent shall be determined subjectively.  This means that the trier of fact must take into account the totality of the relevant circumstances in each particular case.  *In re Rembert*, 141 F.3d 277, 281 (6th Cir. 1998);  *Pleasants*, 231 B.R. at 898.  Intent to deceive may be inferred from the circumstances, including whether the defendant knowingly or recklessly made false representations which the defendant should have known would induce the plaintiff to rely on them.  *Id.*;  *Koep*, 334 B.R. at 372.

In this instance, Debtor's misrepresentation was direct and substantial – his bold, undenied statement to Mr. Dubois at settlement that the Credits had already been sold when in truth they had not.  The analysis therefore must focus upon (a) whether a reasonable basis for the Debtor's claimed mistaken belief existed and (b) whether his overall actions comport with the type of conduct one would expect from someone acting in good conscious, considered in the overall context of this case.  Viewed through that prism, the Court finds that Debtor's representation and subsequent actions establish that he took Plaintiffs' property through subterfuge and secrecy with the intent (and hope) that his scheme would remain undiscovered.  Thus, the circumstances of this case show an intent to defraud Plaintiffs by depriving them of the property rights which he knew had been conveyed to them.

## IV. Testimony

The Parties agree they did not discuss either the conservation easement or the Mitigation Bank Credits during the weeks leading to settlement.  The Listing itself only stated that six acres of the Real Estate was in "conservation easement".  The Listing provided no information with respect to either the existence of the Mitigation Bank or whether any Credit value remained.

As for the settlement date, Mr. Dubois testified that he and Mr. Lindsley primarily discussed the future of the easement; i.e., the ongoing obligations of maintenance, monitoring and reporting

-12-

with respect to the preservation in the *status quo* of the forested area set aside.  Mr. Lindsley
claimed that he was required to perform the necessary maintenance and concomittant duties and
therefore would have to visit the acreage from time to time.  As stated previously the only specific
reference to the Credits themselves was the Debtor's representation that all had been sold.[19]
Therefore, it was Mr. Dubois's understanding that any credit value had already been exhausted.  Mr.
Dubois thus rose from the settlement table with the understanding that 6 acres of the Real Estate had
been set aside as a conservation easement, that Debtor would have to monitor it from time to time in
accordance with the easement's requirements and that any appurtenant Credit value that may have
previously existed (and the concomittant right to profit from it) was gone.  As for the post-settlement
period, Mr. Dubois testified that in one respect Debtor was true to his word as on occasion he
observed Mr. Lindsley walking the Real Estate accompanied by others.

     Mrs. Dubois, a self-described environmentalist and tree conservationist, testified that her
only discussion with the Debtor at settlement involved his claimed duty to continue to maintain the
trees subject to the easement.  She left the settlement with the contented understanding that as a
result of the easement, the six acres would serve for many years as an environmental habitat for
foliage and animals.  She also understood, from Debtor's explanation, that the easement required
him to have continuing maintenance obligations, and an ongoing presence, with respect to the
acreage that was set aside.[20]

---

[19] It is unclear from the record how Plaintiffs came to know that the Credits – as opposed
to the easement itself – actually existed.  Mr. Dubois testified that he probably was told of the
Credits' existence by either the Debtor or the realtor.

[20] Both Mr. and Mrs. Dubois testified that Debtor sold Credits for areas he had not yet
restored, including a 38,000 square-foot spoil pile attributable to the driveway installation and
the former golf course's dump.  Plaintiffs believe that Debtor has yet to restore the property to its
original condition as required by the easement.  In particular, Mrs. Dubois testified that while
Debtor had worked to maintain the trees he had not begun the larger remediation tasks.  Debtor
disputed Plaintiffs' characterization of both the size and expense of removing the spoil pile.  He

-13-

However, three years after settlement her perspective began to change when in July 2003, she witnessed a group of unknown individuals on the Real Estate.  Upon confronting the men, she learned they were employees of the Maryland Department of the Environment and were there to assess the survivability of the trees in order to determine whether an additional $10,000 in Credits could be sold.  Spurred by the news that Debtor was conducting an "ongoing business" related to the existence of the easement, Plaintiffs investigated and learned for the first time that Debtor was engaged in the continuing sale of the Credits.[21]   On or around October 15, 2003, Mrs. Dubois testified that Debtor called the Dubois household and left a message to the effect that he had heard Mrs. Dubois had been "snooping around".  As Mrs. Dubois told it, when she returned his call, Debtor said that the Credits were none of her business and also warned her not to talk to anyone about either the Real Estate or the Credits.

On direct examination, Debtor left undisputed much of Plaintiffs' testimony regarding the discussions had at settlement.  Mr. Lindsley summarized the conversation regarding the existence of the environmental easement, and the Credits, as follows:

> "I don't know the exact wording that was discussed, but I made clear that this was six acres of property that was in an easement with the County, that they would have access to their property only to enjoy, you know, walking, playing on it.  That they could not cut any trees, they could not maintain it even,
>
> *    *    *

---

testified that at the time he was installing the driveway, the Parties discussed using the resulting spoil pile for construction.  Debtor stated that the Plaintiffs decided against this and that he then removed the spoil pile.  Debtor also stated that the spoil pile attributable to the golf course dump is in fact only 2,000 square-feet and would cost only $2,000 to remove.  Debtor acknowledged that he ceased performing maintenance at the time he was served with the complaint in the State Court litigation.

[21] Debtor countered that the State was actually there for a poison ivy problem, not to count credits.

-14-

> I heard the testimony of Mr. Dubois talking about credits.  And I
> don't recall what was said about credits other than that. . .".
> Transcript of Record at 33-34.

Thus, Mr. Lindsley did not dispute that he represented to Mr. Dubois at the time of

settlement that all the Credits had been "sold".  Of equal moment is the absence of any evidence

from Mr. Lindsley that he ever told Plaintiffs that Credits still existed and that he intended to

continue selling them post-settlement.[22]  It bears emphasizing here that Debtor may have been

thoroughly honest in isolation about the existence of the 6 acre easement and the limitations that

created with respect to Plaintiffs' future use and enjoyment of the Real Estate.  However, that is an

entirely separate issue from the existence, mechanics and ongoing value of the Mitigation Bank,

established as a "virtual" property interest upon the platform of the easement's dedication to the

County.

Tellingly, when asked to describe on direct testimony "what was in his head" with respect to

the crucial issue – his intent, and the non-disclosure of material facts relative to the Mitigation Bank

– Mr. Lindsley stated:

> Well, simply that they were buying a property that offered them,
> again, approximately two acres to build a home on the waterfront,
> which was right near the water edge, which gave them a very
> attractive site and place to build and to live.  That this was a stately
> looking location.  That the six acres were set aside as this mitigation
> bank.  That they had no responsibility for nor any control of.  Again,
> simply to walk on it.
> Transcript of Record at 35.

In other words, he provided no meaningful explanation at all with respect to the ultimate fact

in issue.  Mr. Lindsley was willing to disclose an abundance of information regarding the

---

[22] As noted earlier, the fact that he did not tell them of the existence of the remaining
Credits, and his intention to sell them, was conclusively established prior to trial by his
admission to Request for Admission No. 13. See Plaintiffs' Exh. 8.

restrictions created by the easement and the claimed ongoing maintenance obligations of MLI. Express and unequivocal disclosure of the existence of the Credits, their substantial value and his intention to continue to sell them post-settlement simply was not provided.[23]

Debtor underpinned his post-closing Credit sales on a presumed severance of the Credits from the Real Estate and independent documents, some of them publicly recorded, that allegedly confirmed that understanding. Debtor claims that he was justified in concluding that actual ownership of the Real Estate was irrelevant to the ownership of the Credits following the May 2000 settlement. He also asserted that his retention of maintenance responsibilities pursuant to the "management plan" with the County, further buttressed the alleged severance.[24]

Debtor agreed that he did have a telephone conversation with Mrs. Dubois on October 15, 2003, but claimed the conversation became heated due to Mrs. Dubois' tone and behavior.[25] Debtor denied telling Mrs. Dubois that she could not talk to anyone about the property or the Credits, highlighting that he did not have the ability to prevent her from speaking to government agencies.

---

[23] During his direct testimony Debtor was asked about the pricing of the Real Estate for sale; i.e., whether the value of the Credits was included or not. At first he testified that the value of the Real Estate – the sale price – did include the value of the unsold Credits. However, he later testified the Credits' value was excluded when asked by the Court for clarification. Whatever the Defendant's actual thought process on this point, it is clear beyond dispute that the Plaintiffs bought and paid for the entire 8 acres, including the area set aside for the conservation easement, and all rights appurtenant thereto.

[24] Again, it is worth noting that Debtor did not submit into evidence any written "management plan" that invested either him, or MLI, with any ongoing maintenance obligations regarding the easement, or, moreover a separate, personal ownership interest in the Credits apart from the land.

[25] In this regard, the Court cannot avoid noting that Mr. Lindsley became agitated and used disgusting and profane language during his deposition in the State Court proceeding in response to what appeared to be relatively innocuous questions from Plaintiffs' Counsel. Plaintiffs' Exh. 7, Deposition of Debtor, Exh. A thereto, pg. 17.

Debtor also stated that during this conversation Mrs. Dubois barred Debtor's future access to the property.

**V. Analysis**

    *A.  The Debtor Misrepresented the True Status of the Credits at Settlement.*

Debtor did not deny that he told Mr. Dubois that all the Credits "had been sold" at the time of settlement.  Patently, this was a false statement.  In the complete absence of any contradictory evidence, the Court accepts Mr. Dubois characterization of the exchange between he and Mr. Lindsley and, moreover, its full impact with respect to the issues presented herein.  When this representation is linked with the Debtor's admission that he never told Plaintiffs of his intention to continue selling Credits after settlement, the resulting inference is elevated to an impressive level of potency.  In other words, Mr. Lindsley was well aware at settlement that Credits still existed in the Mitigation Bank.  Yet he chose not tell Mr. Dubois the truth when the specific question was asked.  And this happened while the Debtor planned on selling the Credits that he failed to disclose.  If the Debtor honestly believed he had the legitimate right to the remaining Credit value, and knew such value existed, why did he hide that information?  In this context, the only possible motivation on his part for choosing dishonesty had to be to purposefully deceive Mr. Dubois so as to continue selling Credits for his own personal benefit.  If that were all the evidence showed, then it would shine a powerful light upon the narrow question of intent.  However, there is much more available for consideration.

Before turning to that evidence, it is worth asking whether there was some other conversational exchange or written communication that reflects a good faith effort by the Debtor to inform the Plaintiffs of the complete state of affairs with respect to the Mitigation Bank?  The Court can find none in the record.  The Plaintiffs agreed in their testimony that they were not made aware

of the remaining value in the Mitigation Bank before settlement.  At best, Debtor stressed only that 6 acres of the Real Estate was subject to a conservation easement that protected it from development.  Debtor did not go the crucial next step and explain that significant value in the form of Credits remained tied up in the protected 6 acres.[26]  Whether Debtor affirmatively declared that all credits were exhausted as Mr. Dubois testified or was simply silent on the issue, the Court finds that Plaintiffs were not made aware that they had a significant additional property interest in the Real Estate and that Debtor was not forthcoming about his intention to continue selling that interest once the transaction closed.

> B.  *There was no Documentation that Supported Debtor's Claimed Belief as to His Separate Interest in the Credits.*

At several crucial points during his testimony (both in discovery and during trial), Debtor asserted that either public records, or documents relevant to the sale of the Real Estate, supplied clear notice of the Mitigation Bank Credits.  Debtor relied upon those alleged documents as both the source, and the confirmation of, his claim that the right to retain and sell Credits remained in him and, moreover, as providing due notice to the Duboises of that fact.  For example the following testimony was given at the end of Debtor's direct examination:

Q      The whole concept of the mitigation bank is of public record, is it not?

*      *      *

A      Yes, sir.

Transcript of Record at 39.

That testimony was followed by this early exchange during his cross-examination:

Q      Now, the deed that you executed to the Duboises, that didn't reserve any rights in you, did it, to continue selling credits from their property?

---

[26] See also Plaintiffs' Exh. 7, Debtor's Deposition, pgs. 25-28.

\*   \*   \*

A        The easement gave me that right, I thought.

Transcript of Record at 41.

Accordingly, counsel for the Plaintiffs presented the Debtor with copies of the Declaration (which creates and defines the easement) and the Listing.  With those documents before him, Mr. Lindsley was asked to point out any reference to the Credits in either.

Q        Now my question to you is where does it make any reference in that document [the Declaration] . . .to credits that are being sold in exchange or associated with that easement?

A        I don't see any. It doesn't appear that there is anything related to credits except for, again, the management plan.

\*   \*   \*

Q        Now, that listing agreement makes no reference of the seller's right to retain or retain the right to sell credits from this property, does it?

\*   \*   \*

A        "Six acres of lot is in conservation easement." And, again, because of that easement and the management plan, that's where I assumed I have the right to sell credits.

Q        But my question – but so my question, there is no reference to any credits --

A        No there isn't.

Q        – or right to sell, is that correct?

A        No, you're – that's correct.

Transcript of Record at pgs. 44-47.

In short, none of the documents allegedly relied upon by the Debtor as justifying his "mistake" give even a scintilla of support for his claim that either the Credits, or the Mitigation Bank itself, were severed from the Real Estate.  They do not even provide an arguable basis from

-19-

which to draw that conclusion.  Thus, there could have been no reasonable, good faith belief on Debtor's part that any property interest in the Credits remained his to sell after settlement based upon the documents he relied upon.  Likewise, there is even less of a reason to presume that the Plaintiffs would have been alerted to either the Credits or his claim to ownership of them.  The Declaration references a "Management Plan" but it is silent as to the Mitigation Bank and the process of creating, transferring or selling Credits.  The Listing offered the entire 8 acres for sale, subject only to the conservation easement. The Deed transfers the entire estate in fee simple and carves out no exceptions.  No other relevant documents were admitted into evidence.  Mr. Dubois referred to a management plan with the County at trial and hinted that it had some relevance to his professed understanding.  However, no written "management plan" was submitted into evidence.

Debtor is a real estate professional with a level of skill and knowledge commensurate with his long term experience in that field.  It was he who established the Mitigation Bank, without the assistance of counsel, and it is not reasonable to believe that he could have misconstrued the ownership rights to a core property interest arising therefrom based upon the documentary references allegedly relied upon.  Had he desired to legitimately retain ownership of the Credits for himself, he could have added explicit carve-out provisions in the Listing and prospective purchasers would have proceeded on that basis.  Instead, Debtor left the Listing silent on this point as are the other relevant documents.  Plaintiffs were thus left to learn the real score from a chance encounter and their own subsequent investigation.  Accordingly, the Court finds that no documents exist from which the Debtor could have reasonably concluded that he retained a property interest in the Credits after the settlement.

> *C. Debtor did not Establish that Ongoing Maintenance Obligations Created a Property Interest in the Credits for His Benefit.*

Notwithstanding the fallacious contentions addressed above, Debtor asserts as an additional ground a belief that his ability to continue selling Credits after the settlement was grounded in the management plan that placed a continuing duty on MLI to maintain the protected six acres. Debtor claims that because of this ongoing responsibility, ownership of the Real Estate was irrelevant to the ownership of the Credits and that a property interest arose in him as a *quid pro quo*.

For reasons that should now be clear, the Court finds this explanation utterly unconvincing. The easement created by the Declaration was of course binding upon MLI as grantor when it owned the Real Estate. However, it was also made expressly binding upon MLI's "successors and assigns" by the Declaration. Plaintiffs' Exh. 6. In short, Plaintiffs *are* MLI's successors and assigns and upon transfer of title, all the benefits and burdens devolved upon them to the complete exclusion of MLI. While the Declaration does create ongoing maintenance obligations for the protected acreage, none are deemed personal to MLI as opposed to merely transferring to its successors-in-interest. Likewise, the Declaration says nothing about MLI continuing to have responsibility for maintenance in the event the Real Estate is transferred. Moreover, as noted above, while Mr. Lindsley relied upon the "management plan" referred to in the Declaration as creating maintenance obligations, no such plan was offered into evidence. If such a management plan exists, his failure to submit it in his defense speaks volumes.

The Court is of the opinion that it is just as likely, in light of the totality of the surrounding circumstances, that Mr. Lindsley simply told the Plaintiffs he had ongoing maintenance responsibilities in order to further cover-up his scheme to sell their property. This tactic would give him an excuse to visit the Real Estate at will and also remain in contact with the County to the exclusion of the Plaintiffs. In any event, the evidence showed only a minimal amount of maintenance work on his part and certainly not enough to support a bill for $135,347.

-21-

The Court finds there was no reasonable basis for Mr. Lindsley's claim that he had ongoing maintenance responsibilities, or if they existed, that those responsibilities entitled him to the value of the Credits. Therefore, the Court finds that these assertions do not justify his claimed mistake and are therefore not supportive of subjective good faith.

> D.  *The Manner in Which the Debtor Sold the Remaining Credits Post-Settlement is Relevant to his Subjective Intent.*

Debtors' scheme spanned several years. After the May 2000 settlement, Debtor sold $135,347 in mitigation credits in at least 15 separate transactions. Debtor, via MLI, utilized a form contract which identified MLI as the "landowner". Debtor claimed that the form contract, created when he began lawfully selling credits, was used 'in error' after the sale of the Real Estate to Plaintiffs. Plainly, Defendant knew MLI was not the landowner when these sales were made. Debtor's explanation for this egregious and blatant misrepresentation is that he did not read the contracts and did not pay close attention to what the forms said prior to the initiation of the litigation, at which time he ceased selling credits. Relying upon his professed belief that he had the right to sell the Credits at the time of each transaction, he shrugs off the crucial misrepresentation as amounting to nothing. Thus, the inaccurate form contract is claimed to be oversight and not evidence of his attempt to pull a fast one on both the buyers of credits and the Plaintiffs.

Once again, the Court must reject Debtor's claim out of hand. With the Debtor's long time profession as background, it is impossible to believe he was not aware of this glaring error. Directly below his signature line, the documents recite that the "landowner" is "Marte Lynn, Inc." Even the most cursory inspection of each agreement would have revealed this repeated error, and it is not reasonable to believe that he signed each, with its separate purchasers and varying material terms, without a single close reading. The Court simply cannot fathom how Debtor could have somehow overlooked in good faith these repeated untruths or, failed to correct the form contract so that it

accurately reflected MLI's status.  Since he contends that he believed he could continue to sell the Credits, revising the form contract to reflect that MLI owned the "credits", but did not own the "land", should have had no detrimental effect on his rights.  Instead, Debtor decided to leave the form contract in its original state with the misrepresentation waving like a red flag.  The Court can only conclude that Debtor knew he *had to* own the Real Estate to sell the Credits and that no purchaser would have accepted a contract signed by anyone less than the landowner.  In short, the later misrepresentations included in the sales agreements are additional, powerful evidence of the Defendant's bad faith and subjective evil intent.

### *E.  The Independent Value of the Credits is Irrelevant to the Rights of the Landowners.*

As a final argument, Debtor asserts that the total purchase price is evidence that he did not intend to defraud Plaintiffs.  While his testimony was contradictory on this point, in the end Debtor testified that the total purchase price only reflected the value of the 2-acre parcel and that if he had intended to transfer ownership of the Credits, the sales price would have been higher.  Debtor testified in a similar fashion in his deposition in May 2006.  However, this contention is completely irrelevant as there is no dispute that Plaintiffs purchased the entire 8 acre tract for an agreed upon price.  As no rights or property interest were carved out and retained by Defendant, and as there is no contention that the price was inadequate, any claim that the Real Estate would have been "worth more" with the Credits included is completely spurious.

## VI. Conclusion

In conclusion, the Court is required to subjectively evaluate the totality of circumstances presented.  In that regard, the Court must first be cognizant of the undisputed facts and the logical inferences to be drawn from such facts.  Debtor sold Mitigation Bank Credits to third-party purchasers after transferring fee simple title to the real property to Plaintiffs, resulting in the

-23-

judgment that spawned his bankruptcy and this litigation.  When asked at settlement, Debtor told
Mr. Dubois that no Credits remained to be sold.  In reality, substantial Credit value remained to be
exploited and Debtor intended to do so.  Thus, Debtor did not tell the Plaintiffs the truth and then
used that initial misrepresentation to create a climate suitable to the surreptitious sell off of
Plaintiffs' property interests.

The documents of public record do not refer to the Credits nor do they dispel the conclusion
that the Debtor committed fraud.  Having hidden the Credit's existence from Plaintiffs, Debtor then
sold them away with the knowledge that he had transferred title in the underlying property to
Plaintiffs.  In order to effectuate each sale, Debtor, a real estate professional, continued to hold
himself out as the owner of the underlying property.

Quite simply, based upon this set of facts, the preponderance of evidence compels the
conclusion that Debtor knowingly misrepresented that state of the Credits in order to purposefully
deprive the unwitting Plaintiffs of their property rights.  Thus, the Court finds that Debtor
subjectively intended to defraud Plaintiffs and all the elements of Section 523(a)(2)(A) have been
established.  On that basis, the Plaintiffs' judgment and underlying debt will be excepted from the
Debtor's discharge.   A separate order will issue.


cc:     Stephen A. Oberg, Esq.
        Wayne T. Kosmerl, Esq.
        *Counsel for Plaintiffs*
        Council, Baradel, Kosmerl & Nolan, P.A.
        125 West Street
        4th Floor; P.O. Box 2289
        Annapolis, MD 21404

        Charles J. Broida, Esq.
        *Counsel for Debtor-Defendant*
        5401 Twin Knolls Road, No 7
        Columbia, MD 21045

Frank Dubois
Cathleen Dubois
5990 Deal Beach Road
Deale, MD 20751

Harry E. Lindsley
1014 Creek View Court
Churchton, MD 20733

**End of Order**